# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

January 12, 2026

**BY ECF**

Hon. Lorna G. Schofield
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

RE:   **United States v. Edwin Medina Guarache**
      **25 Cr. 80 (LGS)**

Dear Judge Schofield:

Last week, following the abrupt capture of Nicolas Maduro, "[t]he UN chief noted that Venezuela has endured decades of internal instability and social and economic turmoil, with democracy undermined and millions of people forced to flee." Vibhu Mishra, *UN chief deeply concerned over 'possible intensification of instability" in Venezuela*, UN News (Jan. 5, 2026) available at https://news.un.org/en/story/2026/01/1166701.

Edwin Medina Guarache was one of those millions. In 2020, Mr. Medina, a Venezuelan citizen, left his home country and ultimately entered the United States unlawfully to escape the conditions Mr. Maduro had propagated in Venezuela. Now, they are housed in the same correctional facility.

Edwin Medina has accepted responsibility for unlawfully possessing a firearm and illegally reentering the United States. He understands that as a result, he will be subject to deportation to Venezuela. He will have to restart his life yet again.

> I am so sorry for the mistake I made. I have paid for my actions and suffered the consequences every day I have been at MDC, unable to see my family. I only ask that you please give me the opportunity to have my freedom again so that I can help my mother and grandmother. I did not come to this country to cause harm. I came to work to improve the lives of my family. For my whole life I have thought that if they are doing well, then I am doing well.

Letter of Edwin Medina Guarache, Ex. A.

The eleven months Edwin Medina has languished at the MDC as a result of his actions have been sufficiently punishing. Sentencing Mr. Medina to additional time in a federal prison is

simply unwarranted. As probation notes, Mr. Medina's "lack of a prior record, status as a non-violent offender, and positive institutional adjustment remain important factors to be considered in this case." Presentence Report at 21. This, coupled with Mr. Medina's near certain deportation to Venezuela, counsels in favor of a sentence of time served without supervised release—just days shy of the bottom of the applicable advisory Guidelines range.

## I.      Background

Born in Venezuela, Edwin Medina Guarache was raised by his mother, grandmother, and great-grandmother. His parents separated when he was young; he has no memories of his parents together. Edwin's childhood home was divided into two sections: Edwin lived with his mother, aunt, cousin, and grandmother on one side of the house; his great-grandmother occupied the other half. "I remember my mother working as a cashier at a horse racing center, and my grandmother made and sold tobacco her entire life to support us." Letter of Edwin Medina Guarache, Ex. A. His father also worked: maintaining refrigerators, carpentry, iron work, mending electrical fences, mechanics—his father could do it all. Edwin recalls "learning a little" from helping his father with work when he was young.

When he was a small child, Edwin's sister, Rosannys Valentina, passed away. She was just two days old. As Edwin describes it, "she stopped breathing right after birth." Though he barely spent any time with her, Edwin's left arm is adorned with a tattoo of his sister's name and dates of birth and death, a permanent reminder of his short time with her.

As a child in Venezuela in the early 2000s, life was relatively simple. Edwin attended school and climbed the mango tree in his front yard. Apart from kicking a soccer ball around inside of the house, Edwin rarely got in trouble.

But in April 2013, with the election of Nicolas Maduro as president of Venezuela, life changed. Presentence Report ¶ 52. "As president, he presided over more than a decade of policies that sent Venezuela's economy into free fall…." Jorge Valencia, *The rise and fall of Nicolas Maduro*, NPR (Jan. 5, 2026) available at https://www.npr.org/2026/01/05/g-s1-104501/rise-and-fall-nicolas-maduro. Though Edwin always had enough to eat, his family, like many, began to suffer.

After graduating from high school, at 18 years old, Edwin joined the Venezuelan military. Initially, he viewed it as an honor, a privilege. "I enlisted in the Venezuelan army when I was young because I craved the discipline it taught others. I felt like it would give me a purpose." Letter of Edwin Medina Guarache, Ex. A. "He always liked that world," his mother recalls, "the military, serving people, and wanted to be part of it." Letter of Ana Candelaria Guarache Marquez, Ex. B. "He was excited about this new stage in his life." *Id.*

Edwin trained for months and served even longer. During training, he slept in a large room with nearly 100 people from around the country. Letter of Edwin Medina Guarache, Ex. A. It was then that Edwin experienced his first glimpse of the military's abuse of power. "Sometimes they would make soldiers stand outside our room for days without any breaks." *Id.* He describes, "Once, one of our roommates was caught smoking and everyone had to stand outside while they threw

cold water and mud at us." *Id.* "Other times they used us to do things that had nothing to do with the army," like caring for a lieutenant's chickens. *Id.*

Throughout his time in the military, Edwin bore witness to the abuse Venezuelans suffered under Maduro's rule. "My country was going through a food shortage, and the government would sometimes send trucks full of food to different places. One time at one of the places, the people became frustrated because they were hungry, and we were ordered to go there and beat them. This happened many times." *Id.* Edwin expected the army to be on the side of the people; it wasn't. He has described watching people starve, being sprayed with tear gas and shot. "The only thing I could think of was that that could easily be my family." *Id.*

"I also lost friends during my time in the army." *Id.* "[A]fter losing one of his friends in the military and the death of his great-grandmother, he didn't want to go back," Edwin's mother shares. Letter of Ana Candelaria Guarache Marquez, Ex. B. "I became afraid that it would be me next. I became disillusioned with everything about the army. I had joined to do something good with my life, but I realized that I was doing more harm than good." Letter of Edwin Medina Guarache, Ex. A. "He left the military and started working at a tire shop repairing tires." Letter of Ana Candelaria Guarache Marquez, Ex. B.

Edwin had cut ties with the military, but life at home proved challenging. "The economy in Venezuela was terrible at that time due to the food shortage." Letter of Ana Candelaria Guarache Marquez, Ex. B. Edwin's mother did not have a stable job, "and it was becoming increasingly difficult to afford groceries." *Id.* Edwin left Venezuela "because there was no longer a way to make a living." Letter of Edwin Medina Guarache, Ex. A. "After leaving, I spent a few years in Ecuador begging for money, working in restaurants, and selling whatever I could at a market." *Id.* Edwin "used the little he earned" to help his mother and grandmother. Letter of Ana Candelaria Guarache Marquez, Ex. B.

"I then decided to come to the United States. I thought my life could be better here." Letter of Edwin Medina Guarache, Ex. A.

Arriving in the United States in late 2023 with childlike dreams of "working in show business," reality pummeled Edwin Medina, who surrendered at the border of Mexico. For days, he was held in immigration custody in El Paso, Texas. When asked why he came to the United States, Mr. Medina told border patrol agents the truth:

Q: Why did you leave your home country or country of last residence?

A. Because I am scared for my life.

With good reason. Beyond his country's severe economic decline and humanitarian crisis, in Venezuela, Mr. Medina feared he had become a target. "I participated in protests against the government because of their injustice towards the people of the country. I was becoming afraid that the army would put me in jail for leaving without permission." *Id.*

From Texas, Mr. Medina traveled by bus to New York, where he provided his contact information and was told to await a call from immigration officials. The call never came. When Mr. Medina arrived in New York City in late November 2023, he was taken to a shelter in Brooklyn, where his phone, clothing, and immigration paperwork was stolen. Presentence Report ¶ 53. He had nothing. After 30 days, Mr. Medina was ordered to leave the shelter. He knew no one in New York. *Id.* With nowhere to stay, Mr. Medina spent the next several weeks living on the subway. Police officers frequently pulled him off the trains. But he reasoned, "In the winter at least it's warm on the train." Still, spending nights on the train was dangerous. Once, "he fell asleep and had money stolen from him and the thieves were attempting to remove his watch when he woke up." *Id.*

After weeks of sleeping on the train, Mr. Medina moved to a house in Brooklyn "which had been divided into two apartments, with nine people living in the apartment with [Mr. Medina]." *Id.* But that housing situation was short lived. Months later, he found himself homeless yet again. He returned to living on the streets and in the train. *Id.* Mr. Medina would ride the Q train from Manhattan to Coney Island. He would use the restroom at the 42nd Street terminal and showered in a park on 43rd Street between 8th and 9th Avenues.

Eventually, Mr. Medina found his way to the Bronx, where he rented a room in an apartment on Morris Avenue. *Id.* "From that day on, my goal was to work hard enough to pay my rent and help my family." Letter of Edwin Medina Guarache, Ex. A.

As Mr. Medina shared with his mother, life in the United States was "hard and expensive." Letter of Ana Candelaria Guarache Marquez, Ex. B. Having arrived with childlike dreams of "working in show business" Edwin quickly shifted "to focus on finding traditional labor." Presentence Report ¶ 53. "But he never complained about having to work." Letter of Ana Candelaria Guarache Marquez, Ex. B. Mr. Medina earned what he could by borrowing a roommate's car and renting another person's Uber and Instacart accounts to deliver food. Sometimes he earned money helping people move. Mr. Medina's family relied on his meager earnings in the United States to survive in Venezuela. He sent his mother "money for food, clothes, and [his grandmother's] medicine when she was sick." *Id.*

Around 3:30 p.m. on February 12, 2025, while Edwin Medina was asleep inside of a parked car he had borrowed to make deliveries, multiple officers knocked on the car window. One officer ordered Mr. Medina to "get the fuck out" of the vehicle. Another opened the passenger door and began rooting through the car, finding nail clippers in the center console. While Mr. Medina was still half asleep, one of the officers yanked him out of the car by his arm. The officers held Mr. Medina against the side of the car and handcuffed him for two summons warrants—one for littering, in violation of New York City Administrative Code § 16-118, and one for violation of New York's open container law, New York City Administrative Code § 10-125.

After pulling Mr. Medina from the car, an officer asked if he had anything sharp on him. Mr. Medina immediately told the police there was a gun in the car, under the driver's seat. The officers searched the car and recovered the gun.

4

The next day, Mr. Medina was presented in magistrate court on a criminal complaint charging one count of illegal reentry, in violation of 8 U.S.C. § 1326(a), and one count of possession of a firearm by an undocumented individual, in violation of 18 U.S.C. § 922(g)(5). Following a contested detention hearing, Mr. Medina was ordered detained. He remains incarcerated at MDC Brooklyn, where he has been held for nearly one year.

On September 18, 2025, Mr. Medina was scheduled to appear for his change of plea hearing in magistrate court. On the way to the courthouse, the van driving him to court was rear-ended; Mr. Medina was taken to the hospital for medical clearance before returning to the MDC later that day. Though Mr. Medina did not suffer serious injuries, "he still suffers from sharp pain in his back if he sits for too long or strains his back." Presentence Report ¶ 60. The day after the accident, Mr. Medina told "MDC medical staff that he had been experiencing lower back pain since awaking that morning." *Id.* He was prescribed ibuprofen and advised to purchase additional medication from the commissary if the pain did not abate.

The following week, Mr. Medina appeared in court and accepted responsibility for his actions, pleading guilty to the Indictment. He is scheduled to appear for sentencing on February 3, 2026 at 11:00 a.m.

## II.    Time served with no supervised release is the most appropriate sentence for Edwin Medina Guarache.

The defense agrees with probation's calculation of the applicable advisory sentencing range under the Guidelines. Because Mr. Medina has no prior convictions, he is in Criminal History Category I. With a total offense level of 13, Mr. Medina's Guideline range is 12 to 18 months' incarceration. Because Mr. Medina will have served just shy of 12 months of incarceration at the time of his February 3 sentencing, a time served sentence is not only within the applicable Guideline range, but it is effectively *higher* than the average sentence imposed on individuals whose primary Guideline was § 2K2.1, with an offense level of 13 and Criminal History Category I. Presentence Report at 17. And this is to say nothing of the additional time Mr. Medina will undoubtedly spend in immigration detention after the completion of his federal sentence. A time served sentence is also consistent with probation's recommendation of 12 months' incarceration. *Id.* at 20.

"A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc). In exercising this discretion, the Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)," which requires the Court to "'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)": "proportionality, deterrence, incapacitation, and rehabilitation." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013) (quoting *United States v. Dorvee*, 616 F.3d 174, 183 (2d Cir. 2010)). In determining the appropriate sentence, the Court must "consider every convicted person as an individual," and its sentence must "fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487–88 (2011) (citations omitted).

Because a final order of removal against Mr. Medina has been reinstated, *see* Presentence Report ¶ 55, he faces near certain deportation after the completion of his federal sentence. Accordingly, the defense agrees with probation that the Court should not impose a term of supervised release. *See* U.S.S.G. § 5D1.1(c); Presentence Report at 20.

### A.    The nature and circumstances of the offense counsel in favor of a time served sentence.

Edwin Medina entered the United States unlawfully in 2023 after escaping Venezuela out of necessity. He was not alone. In the wake of Nicolas Maduro's ascension to power, the country's economy crumbled. "The collapse set off one of the largest migration movements in the world. At least 7.9 million Venezuelans have fled the country, according to the United Nations Refugee Agency, seeking safety and the means to feed their families. Many have crossed the often deadly rainforest passage of the Darién Gap linking Colombia and Panama on their way to the United States." Jorge Valencia, *The rise and fall of Nicolas Maduro*, NPR (Jan. 5, 2026) available at https://www.npr.org/2026/01/05/g-s1-104501/rise-and-fall-nicolas-maduro.

To be sure, Mr. Medina entered the United States unlawfully. But it bears emphasis that "[h]istorically, bipartisan recognition of Venezuela's severe human rights violations and political crisis has led to broad support for legal pathways for Venezuelans in the U.S." Washington Office on Latin America (WOLA), *By Terminating Legal Pathways, the U.S. is Abandoning Venezuelans* (Feb. 14, 2025) available at https://www.wola.org/analysis/terminating-legal-pathways-u-s-abandoning-venezuelans/. In 2021, the U.S. Department of Homeland Security designated Venezuela for Temporary Protected Status upon finding that "extraordinary and temporary conditions in the foreign state prevent its nationals from returning safely…." Federal Register, *Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for Venezuelans Covered by Deferred Enforced Departure* (Mar. 9, 2021), available at https://www.federalregister.gov/documents/2021/03/09/2021-04951/designation-of-venezuela-for-temporary-protected-status-and-implementation-of-employment. The program was extended in 2023—the year Mr. Medina entered the United States—and again in January 2025, in apparent recognition of Venezuela's continued deplorable conditions. Federal Register, *Extension of the 2023 Designation of Venezuela for Temporary Protected Status* (Jan. 17, 2025), available at https://www.federalregister.gov/documents/2025/01/17/2025-00769/extension-of-the-2023-designation-of-venezuela-for-temporary-protected-status#footnote-1-p5963. In September 2025, the program was abruptly terminated.

In 2024, the U.S. Department of State issued a report on human rights practices in Venezuela, concluding abuses of human rights had "significantly worsened." *Id.* The report highlighted "credible reports of: arbitrary or unlawful killings; disappearances; torture or cruel, inhuman, or degrading treatment or punishment; arbitrary arrest or detention," among others. *Id.* Mr. Medina arrived in the United States in search of a better life than the one he had in Venezuela.

Just over a year after arriving in the United States, while asleep inside of his friend's car, Mr. Medina was stopped by law enforcement for summons warrants. When questioned by the officers, Mr. Medina immediately admitted that there was a gun in the car. But despite possessing

a gun, Mr. Medina never discharged the firearm. He did not brandish the weapon. He did not threaten anyone with the gun. He never intended to use the weapon to harm any individual. As Judge Caproni observed, "In my view…gun possession cases fall into two camps, one is where the gun used, and the second is where the gun is not used. It is still a crime for a felon to possess a gun, but in my view, a mere possession case, which is what this is, is less serious than many of the gun cases that we see in this district where the gun was used in the commission of some other crime." *United States v. Garlick*, No. 22 Cr. 540 (VEC) (S.D.N.Y. Apr. 2, 2024), Doc. 188, Tr. 38:22–25, 39:1–3.

Notably, Mr. Medina did not unlawfully possess a firearm following a felony conviction. At the time of the offense, he had no criminal history, let alone a prior felony conviction. Instead, the unlawful nature of Mr. Medina's possession of the firearm rests on his status as an undocumented individual in the United States. Were he a citizen of the United States, his possession of a firearm would not have constituted a federal offense.

None of this is to minimize Mr. Medina's conduct, which is unquestionably unlawful. But the nature and circumstances of the offense are comparatively less serious than others charged in this district, a fact the Court should consider when determining Mr. Medina's sentence.

### B. *A sentence of time served is "sufficient, but not greater than necessary" to effectuate punishment and achieve a deterrent effect.*

Additional time in prison is unnecessary to provide "just punishment" for an undocumented young man who, after having been stopped while sleeping inside a car, immediately told law enforcement that there was a firearm in the car. Presentence Report at 21. It is certainly not essential for incapacitation or to protect the public from Mr. Medina, who has no criminal history, where there is no indication he has ever been violent. *Id.*

And additional prison time is not needed as a deterrent, either. By the time of sentencing, Mr. Medina will have served nearly 12 months of incarceration at MDC Brooklyn, where violence pervades and lockdowns are unending, and he will likely spend several more months in immigration detention at the conclusion of his federal sentence. The time he has spent incarcerated at the MDC is sufficient to ensure Mr. Medina will never again return to the United States and risk such brutal conditions of confinement.

In late February 2025, shortly after arriving at the MDC, Mr. Medina experienced his first of many lockdowns at the facility, after a fight broke out in another unit. He sat in a cell for four days, unable to leave for any reason, including to shower or contact his family. Around this time, he was served food with maggots.

Mr. Medina was also suffering physical. During a dental exam, Mr. Medina reported having "intermittent tooth pain more than once a year." *Id.* ¶ 60. The exam revealed that "he had severe crowding and multiple missing teeth with 11 teeth being marked as decayed" and "heavy plaque and inflamed gingivitis with bleeding on probing." *Id.*

On March 16, the facility had no running water. Mr. Medina was locked in his cell for the entire day with a bottle of water to drink and a bucket of water to flush the toilet. Last summer, he

spent a week locked down at the MDC because of a fight. During that time, he was allowed out of his cell to shower only every few days.

For the past six months, Mr. Medina has worked as an orderly at the MDC. Every day he picks up and takes out the garbage, and sprays and wipes down tables. *See id.* ¶ 5. Though Mr. Medina tried to get a job from the moment he entered the MDC, he explained that "you can't get a job right away. First they evaluate your behavior, and if they see you're well behaved they'll give you a job." As probation recognizes, "[t]o [Mr. Medina's] credit, while incarcerated he has not accrued any disciplinary sanctions, which suggests an increased chance at rehabilitation." *Id.* at 21.

While incarcerated, Mr. Medina rarely speaks with his family in Venezuela. "[T]he calls are too expensive and more expensive because they are international." *Id.* ¶ 49. "We miss him so much," Mr. Medina's mother laments. Letter of Ana Candelaria Guarache Marquez, Ex. B. "We used to talk all the time and now we go days and months without speaking. Sometimes I don't know if he's still alive. I feel terrible every day." *Id.*

The eleven months that Mr. Medina has spent incarcerated at MDC Brooklyn is sufficient to deter him from reoffending. "Being at MDC is frustrating because I can't help my family." Letter of Edwin Medina Guarache, Ex. A. "I know that, without my support, they are suffering. Each time I remember what I did, I feel like a fool. I know what I did was wrong, and I regret it every day. I want to go back to my mother and my grandmother, it's been too long since I've seen them. I feel terrible about what I did. I'm so sorry." *Id.* Mr. Medina never again put himself in a position to cause and witness his family's suffering as a result of his arrest.

The government will likely argue that a more extensive period of incarceration is necessary to deter other individuals from illegally reentering the United States and discourage individuals from possessing guns. But no one is going to decide whether to come to the United States based on whether Mr. Medina spends more time in jail. And no one in Manhattan is going to decide whether to unlawfully possess a weapon because Mr. Medina is sentenced to an extensive term of incarceration.

"Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment." U.S. Department of Justice, *Five Things About Deterrence* 1, National Institute of Justice (May 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf. "Laws and policies designed to deter crime by focusing mainly on increasing the severity of punishment are ineffective partly because criminals know little about the sanctions for specific crimes." *Id.* This is particularly true of non-citizens, who are typically unfamiliar with the American legal system, often fleeing terrible conditions, and whose main concern is whether they will be caught and deported, not whether they will serve time before their removal.

Further, Mr. Medina's sentence for unlawful possession of a firearm, a street-level offense, should not be exploited to serve the broader aims of the justice system. *Cf. United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."); *United States v. Stein*, No. 09-CR-377, 2010 WL 678122, at

*3 (E.D.N.Y. Feb. 25, 2010) ("Persons who commit white-collar crimes like defendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of the punishments that may be imposed.").

And finally, it must be noted that Mr. Medina faces a much harder time in a federal prison than an American citizen would. When the immigration detainer is lodged, Mr. Medina will be ineligible for many federal programs, and may not be able to accumulate earned time credits under the First Step Act. His prison time would therefore be longer and tougher than what an American citizen would experience. Given that he still faces immigration detention in the future, sentencing Mr. Medina to additional time in a federal prison would be, under the circumstances, "greater than necessary."

To the extent that this Court is concerned with sending a message to the community, a sentence of time served—effectively 12 months' incarceration, the bottom of the advisory Guideline range—satisfies that aim. Any additional time is simply unwarranted in light of the factors the Court must consider pursuant to 18 U.S.C. § 3553(a).

## III.    Conclusion

Edwin Medina Guarache has already served eleven months at MDC Brooklyn as a result of his offense. His federal sentence will be followed by a period of immigration detention before he is removed to Venezuela, where his mother reports that as a result of Nicolas Maduro's capture, "grocery prices are way above what we can actually afford. The supermarkets are now empty. I haven't received the little help we get from the government to buy our necessities, and I don't know if I ever will. I don't know what's going to happen to us." Letter of Ana Candelaria Guarache Marquez, Ex. B.

Under these circumstances, a time served sentence is sufficient but not greater than necessary.

Respectfully submitted,

*/s/*

Marne L. Lenox

*Counsel for Edwin Medina Guarache*

cc:    Thomas John Wright, Assistant U.S. Attorney

9